UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DANIEL RODRIGUEZ,

                              Defendant.

**DECISION AND ORDER**

12-CR-83S

## I) INTRODUCTION

Pending before the Court is a motion (Dkt. No. 135) by defendant Daniel

Rodriguez ("Rodriguez") to dismiss the indictment or, in the alternative, to set bail

or at least to direct the United States Marshal Service ("USMS") to house him in

the Western New York area.  Rodriguez has requested bail twice before, based

on the usual bail factors set forth in 18 U.S.C. §§ 3142(c) and 3142(g).  (Dkt.

Nos. 50, 113.)  The pending motion differs from Rodriguez's prior requests in that

it rests on his remote detention.  Beginning around May 19, 2014, the USMS

moved Rodriguez to Ohio and then Virginia, hundreds of miles away from

counsel.  Rodriguez argues that the distance between him and counsel makes

face-to-face consultation impossible for important pretrial matters related to

discovery review, motion and hearing preparation, and discussions that could

lead to an early resolution.  If Rodriguez cannot prepare his defense as

effectively as when he was housed locally, he concludes, then his remote

detention violates his Sixth Amendment right to effective assistance of counsel.

The Government opposes Rodriguez's motion for several reasons.  The Government has reviewed Rodriguez's detention history and notes that Rodriguez was in local custody for more than 800 days before his remote detention began.  Given how much time Rodriguez had to prepare his case while housed locally, and given how recently remote detention began, the Government concludes that Rodriguez's communication with counsel has not actually suffered and is premature at best.  The Government also points to alternative means of communication and travel that Rodriguez's counsel have available to them.  Finally, the Government argues that Rodriguez's Sixth Amendment claim fails without a showing of actual prejudice.

The Court held oral argument on July 22, 2014.  For the reasons below, the Court denies Rodriguez's motion but without prejudice to revisit the issue after 60 days.[1]

## II) BACKGROUND

The Court will summarize the case briefly and otherwise will assume familiarity with its history.  This case concerns allegations that Rodriguez and co-defendants Ernest Green ("Green") and Rodshaun Black ("Black") conspired to commit Hobbs Act extortion against someone named  Jabril Harper.  In the one-

---

[1] Rodriguez nominally asks for dismissal of the indictment but devotes every section of his motion to nondispositive arguments for bail or for relocation.  The Court accordingly will address the motion as a nondispositive bail motion.  Alternatively, given how briefly the request for dismissal occurs and given the Court's desire for a more complete record as explained below, the Court summarily recommends rejecting any request for dismissal without prejudice.

count Indictment, filed March 6, 2012, the Government alleges that Rodriguez "did knowingly, willfully and unlawfully combine, conspire and agree together and with others, known and unknown to the Grand Jury, to obstruct, delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery as that term is defined in Title 18, United States Code, Section 1951(b)(1), and extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), in particular, the robbery and extortion of assets, including jewelry, mobile telephones, cocaine base, and money, from Jabril Harper a/k/a Bril, an individual engaged in the unlawful possession and distribution of controlled substances, including cocaine base.  All in violation of Title 18, United States Code, Section 1951(a)." (Dkt. No. 1.)  In a pre-indictment complaint filed against Green (Case No. 12-MJ-2037, Dkt. No. 1), the Government provided details from its investigation and from confidential informants that the conspiracy in question culminated in the kidnapping, armed robbery, and murder of Harper on December 16, 2009.  The Government has disclosed that Rodriguez was accomplice "A-2" in the pre-indictment complaint against Green.  The case is considered "death penalty eligible"; the Government has not yet informed the Court of a formal "no seek" decision from the Department of Justice.

Rodriguez has been in continuous federal custody since his arrest on March 6, 2012, but his locations have changed.  From March 6, 2012 until about

May 19, 2014, the USMS housed Rodriguez in various detention facilities in the

Western New York area.  After May 19, 2014, the USMS began housing

Rodriguez in two places outside Western New York.  Rodriguez spent some time

at the Northeast Ohio Correctional Center in Youngstown, Ohio, approximately

185 miles by road from downtown Buffalo.  The USMS then moved Rodriguez to

the Northern Neck Regional Jail in Warsaw, Virginia, approximately 483 miles by

road from downtown Buffalo.  Counsel for Rodriguez and the Government

received notice of the moved to Virginia through an email message from the

USMS.  (Dkt. Nos. 135 at 8 and 136 at 9.)  In the message, the USMS advised

counsel to "consider sending orders to produce (OTP's) 10 business days before

scheduled hearing dates" to help ensure Rodriguez's appearance at future

proceedings.  (*Id.*)  Rodriguez's counsel responded to the Virginia move by

writing a letter to the USMS requesting a closer pretrial detention facility.  (*Id.* at

11–13.)  The letter emphasized that the move to Virginia hampered Rodriguez's

right to effective assistance of counsel because "[t]he parties are currently

engaged in extensive discovery review and motion practice."  (*Id.* at 11.)

According to Rodriguez, the USMS never responded to the letter.  Meanwhile,

the record contains no details about the logistics of Rodriguez's remote

detention, such as: how many times counsel has asked the USMS to produce

Rodriguez for face-to-face consultation in Buffalo, and how the USMS might have

responded to those requests; USMS policies regarding defendant transport,

4

apart from the request for 10-day advance notice; and the policies of the remote detention facilities in Ohio and Virginia, particularly with respect to accommodating attorney visits and arranging private telephone and video conferences.

Rodriguez has followed up on his request to the USMS by filing the pending motion.  Rodriguez argues that the distance between him and his counsel deprived him of the ability to continue a meaningful attorney-client relationship.  Rodriguez's counsel would have to drive approximately 8.5 hours one way to see him; even a same-day, round-trip flight arrangement would require an entire day of travel.  Attorneys for defendants housed locally do not face that kind of travel burden.  With oral arguments coming up and pretrial hearings at least possible, Rodriguez needs to review pretrial strategies face-to-face with counsel but cannot.  "Given the significant distance between Mr. Rodriguez and his attorneys, his participation in discovery review and further practice has been wholly curtailed."  (Dkt. No. 136 at 3.)  Rodriguez concludes that this curtailment violates his Sixth Amendment right to effective assistance of counsel, which justifies dismissal of the indictment altogether.  In the alternative, Rodriguez asks for one of two accommodations that at least would help him prepare his defense with counsel—either release on bail or a transfer to a detention facility in Western New York, where counsel could meet with him much more easily.  Rodriguez's requests coincide with the Court's direction, in its first

5

order denying Rodriguez bail, that "defendant shall be afforded reasonable opportunity for private consultation with counsel."  (Dkt. No. 67 at 8.)  That language tracked the statutory language of 18 U.S.C. § 3142(i)(3).

The Government opposes any of the requested relief in Rodriguez's motion.  From March 6, 2012 to May 19, 2014, Rodriguez was in local custody for more than 800 days before his remote detention began.  In pointing out the length of local custody, the Government implies 1) that Rodriguez had plenty of time while housed locally to work with counsel on the main structure of his defense for this case; and 2) that Rodriguez saw his counsel sufficiently infrequently while he was housed locally that remote detention will make no practical difference.  More explicitly, the Government argues that Rodriguez's motion ignores the USMS's need for discretion in managing housing to address logistical and safety concerns.  The Government also argues that Rodriguez's motion makes no mention of alternative methods of communication, even if only to disapprove of them.  According to the Government, detention facilities used by the USMS have the capacity for private telephone and video consultation that respects the privileged nature of the attorney-client relationship.  Finally, the Government points to Rodriguez's inability to allege actual prejudice. Rodriguez's counsel highlights the length of a drive to Virginia, but the Government counters that the Virginia facility is less than two hours from Reagan National Airport in Washington, D.C., "which has direct-flight service to and from

Buffalo and would allow for a same-day round-trip, including a multi-hour in-person visit." (Dkt. No. 139 at 2.) While flight arrangements perhaps would impose some inconvenience, inconvenience alone does not establish a Sixth Amendment violation. Consequently, according to the Government, Rodriguez "has not delineated any *actual* inability to meet with or talk to counsel, and he has not alleged that the Marshals have hindered any such attempt in any way." (*Id.* at 4.)

## III) DISCUSSION

### A)        *Statutory versus constitutional grounds*

Before the Court addresses the substance of Rodriguez's motion, it must address two preliminary matters. The first matter concerns refining the exact issue that requires resolution. Rodriguez has not furnished much information about any policies or practices actually governing his remote detention. Rodriguez also filed the pending motion almost immediately after his remote detention began, claiming that the "vast distance between [him] and his attorneys has created an immediate violation of his Sixth Amendment right to the effective assistance of counsel." (Dkt. No. 136 at 4.) Rodriguez then cites cases containing Sixth Amendment analyses, such as *Cobb v. Aytch*, 643 F.2d 946 (3d Cir. 1981), and *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled by Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989) ("[W]e prefer the express flexibility of the [*Turner v. Safley*, 482 U.S. 78 (1987)] reasonableness

standard."). Rodriguez concludes his motion by stating that his "right to effective assistance of counsel was violated by his recent transfer to a facility in Warsaw, Virginia." (*Id.* at 5.) Rodriguez's choice of language is important because he is stating fairly clearly that he suffered no Sixth Amendment violation while housed in Western New York, and that the sole cause of his Sixth Amendment violation is the distance from his counsel in itself. Consequently, the sole issue that the Court needs to resolve appears to be whether remote detention of either 185 or 483 miles categorically infringes on Rodriguez's right to effective assistance of counsel.

Yet the Court must refine Rodriguez's issue a little further because of an important principle of judicial restraint that the parties have not addressed. "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, *J.*, concurring) (citations omitted). When the Court issued its first order denying Rodriguez bail, it included the mandatory language from 18 U.S.C. § 3142(i)(3) requiring that "defendant shall be afforded reasonable opportunity for private consultation with counsel." (Dkt. No. 67 at 8.) The Court will spend some

8

time in the sections below explaining what that mandate means.  Any definition

or explanation of Section 3142(i)(3), however, necessarily implicates the Sixth

Amendment.  The Sixth Amendment sets minimum standards for attorney

conduct and strategy that potentially affects the outcome of a case.  Section

3142(i)(3) reaches above minimum conduct affecting case outcomes and

suggests how an attorney-client relationship ought to proceed leading up to

trial—it assumes that the attorney and client will consult each other regularly and

then mandates the removal of any impediment to "private" consultations that are

qualitatively and quantitatively "reasonable."  Consequently, compliance with

Section 3142(i)(3) virtually guarantees compliance with the Sixth Amendment, so

long as an adequately skilled attorney works in good faith to stay in touch with a

client and to solicit the client's input regarding trial strategy.  Only attorneys who

choose to ignore their clients theoretically could violate the Sixth Amendment

while still receiving the opportunities protected by Section 3142(i)(3).

Rodriguez's counsel do not present that scenario.

The fully refined issue before the Court thus is whether Rodriguez's remote

detention of either 185 or 483 miles categorically violates 18 U.S.C. 3142(i)(3).

Answering that question will require the Court to assess the phrases "reasonable

opportunity" and "private consultation with counsel."  The Court cannot find any

guidance to these phrases from the plain text of the section or the extensive

legislative history of the Bail Reform Act of 1984 that generated it.  *See* Heidi Joy

Herman, *United States v. Salerno: The Bail Reform Act Is Here to Stay*, 38

DePaul L. Rev. 165, 197 (1988) ("[T]he Act only requires that the detainee be

given a reasonable opportunity to consult with counsel.  This obviously impairs

the defense of one who is a detainee when more than a reasonable opportunity

to consult may be necessary to prepare an adequate defense.  Furthermore,

there is no standard as to what opportunity is reasonable and who is to

determine this standard.").  The Court will proceed assessing the ordinary

meaning of those phrases, alone and in the context of other aspects of criminal

law practice.  *Cf. U.S. v. Stewart*, 311 U.S. 60, 63 (1940) ("Congress will be

presumed to have used a word in its usual and well-settled sense."); *see also*

*Boumediene v. Bush*, 553 U.S. 723, 776 (2008) ("When interpreting a statute, we

examine related provisions in other parts of the U.S. Code.").

### B) *What is a "reasonable opportunity"?*

The first phrase from Section 3142(i)(3) that the Court has to examine is

the phrase, "reasonable opportunity."  Any detention conditions short of solitary

confinement will provide some kind of opportunity for communication with

counsel.  Although the parties here did not make much of a record in this regard,

nearly all modern detention facilities have some kind of capacity for telephone

conferences, videoconferences, written correspondence, and attorney visitations.

Out of the 94 federal judicial districts, most of them likely do not have a detention

facility adjacent to or immediately near their respective courthouses.  *Cf. U.S. v.*

*Argraves*, No. 3:09CR117MRK, 2010 WL 283064, at *6 (D. Conn. Jan. 22, 2010)

("The Court is sympathetic to Mr. Argraves's concerns, and acknowledges that

his detention at Wyatt imposes some obstacles to his preparation for trial.  That

is why each member of the District Court has repeatedly asked federal legislators

to build a detention facility in Connecticut.").  How can the Court determine when

some combination of opportunities for attorney-client communication meets or

falls short of the threshold for being reasonable?

The Court first draws guidance from the word "reasonable" itself.  The first

two definitions of "reasonable" in Black's Law Dictionary are "fair, proper, or

moderate under the circumstances"; and "according to reason."  *Black's Law*

*Dictionary* (9th ed. 2009), *available in* Westlaw (search for "reasonable").  The

first example listed after those definitions helps describe the term and captures

the Court's difficulty in defining it: "It is extremely difficult to state what lawyers

mean when they speak of 'reasonableness.'  In part the expression refers to

ordinary ideas of natural law or natural justice, in part to logical thought, working

upon the basis of the rules of law."  *Id.* (quoting John Salmond, *Jurisprudence*

183 n.(u) (Glanville L. Williams ed., 10th ed. 1947)).  Applying the dictionary

information to Section 3142(i)(3), a "reasonable opportunity" to consult counsel

would promote fairness by allowing pretrial defendants, who are presumed

innocent, to review discovery; to weigh in on any substantive aspect of any

substantive pretrial motion; to formulate trial strategies such as whether to testify

11

at trial; and to consider potential collateral consequences of a plea agreement.  A "reasonable opportunity" also would be "moderate" by avoiding limitations on consultation that safety or similarly important logistical needs would not require.

The above approach to the phrase "reasonable opportunity" is consistent with other uses of the word "reasonable" in criminal practice.  Out of numerous examples, other sections of the Bail Reform Act itself address whether a condition or combination of conditions of release "will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1)(B); *see also id.* §§ 3142(b–g) (passim). This passage requires judges to promote fairness, logic, and moderation by imposing conditions that have some direct connection to assuring appearances and safety while avoiding disproportionate conditions that risk encroaching on the presumption of innocence.  The Speedy Trial Act uses the terms "reasonable" or "unreasonable" numerous times, covering scenarios such as: defendant transport time in excess of 10 days that is presumed unreasonable, 18 U.S.C. § 3161(h)(1)(F); delay, up to 30 days, that is reasonably attributable to a court's consideration of a motion, *id.* § 3161(h)(1)(H); codefendants who delay each other's progress to trial in the absence of a severance motion, as long as the delay is reasonable, *id.* § 3161(h)(6); and any miscellaneous continuance that, if not granted, "would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or

would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, *taking into account the exercise of due diligence*," *id.* § 3161(h)(7)(B)(iv) (emphasis added).  As the Court did above when discussing statutory versus constitutional grounds, the Speedy Trial Act assumes that attorneys act diligently for their clients.  The statute then starts or stops the trial clock based on fairness in allowing defendants to pursue pretrial strategies or unfairness in trial delays that serve no meaningful purpose.  Another example comes from a popular set of model jury instructions and its specific instruction about reasonable doubt.  "[W]hat is a reasonable doubt?  The words almost define themselves.  It is a doubt based upon reason.  It is doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof of a convincing character that a reasonable person would not hesitate to rely upon in making an important decision."  1-4 Hon. Leonard Sand et al., *Modern Federal Jury Instructions-Criminal* § 4.01 (Matthew Bender 2014), *available at* LEXIS.  This example puts the term "reasonable" in the context of protecting defendants' rights except when a logical consideration of a full set of circumstances requires otherwise.

The Court gleans, from the above examples, certain criteria that a "reasonable opportunity" for consultation would have to meet.  The opportunity

would have to allow defendants to review discovery that the Government intends to introduce at trial and to plan non-frivolous motions and other strategies. *Compare Geders v. U.S.*, 425 U.S. 80, 88 (1976) (finding a Sixth Amendment violation where a defendant was ordered, during trial, not to consult counsel during a 17-hour overnight recess, in part because "[o]ur cases recognize that the role of counsel is important precisely because ordinarily a defendant is ill-equipped to understand and deal with the trial process without a lawyer's guidance") *with Chavez v. Pulley*, 623 F. Supp. 672, 685 (E.D. Cal. 1985) ("[B]revity of consultation time between a defendant and his counsel alone cannot support a claim of ineffective assistance of counsel.  This is especially the case where, as here, the petitioner fails to allege what purpose further consultation with his attorney would have served and fails to demonstrate how further consultation with his attorney would have produced a different result."), *quoted in U.S. v. Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989).  The opportunity would account for defendants' criminal histories, behavior reports, medical conditions, and similar logistical problems that have a direct impact on setting up attorney-client meetings.  Finally, the opportunity would not unnecessarily create different tiers of attorney-client relationships.  Any logistical problem that raises the barrier to attorney-client communication will, over time, make a relationship with that problem different than a relationship without it.  An opportunity for consultation may nonetheless be reasonable if a fair consideration of all

14

circumstances requires an alteration in the attorney-client relationship that is proportional to the severity of the logistical problem.  *See Argraves*, 2010 WL 283064, at *6 ("Pre-trial detention will always interfere with preparation for trial to some extent, but the Bail Reform Act clearly contemplates this problem and allows for detention provided that the defendant is 'afforded reasonable opportunity for private consultation with counsel.'") (citing 18 U.S.C. § 3142(i)(3)).

### C)        What is a "private consultation with counsel"?

The next phrase from Section 3142(i)(3) that the Court has to examine is the phrase, "private consultation with counsel," with emphasis on the term "private" and what that term might mean in a prison context.  Of three definitions for the term, Black's Law Dictionary offers two that pertain to individuals: "relating or belonging to an individual, as opposed to the public or the government"; and "confidential; secret."  *Black's Law Dictionary* (9th ed. 2009), *available in* Westlaw (search for "private").  From here, two other considerations come into play.  One consideration is that pretrial detainees are presumed innocent and thus not subject to all of the deprivations of liberty imposed on defendants who have been duly convicted.  The Code of Federal Regulations has a chapter and part devoted to regulations written specifically for pretrial detainees, and any consideration of the term "private" should be consistent with those regulations.  For example, a pretrial defendant remanded to the USMS must receive "appropriate detention facilities available for that individual."  28 C.F.R.

15

§ 551.102.  With respect to legal resources, "The Warden shall provide the

opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis; Staff

shall provide pretrial inmates with access to legal materials in the institution;

[and] Staff shall allow the pretrial inmate, upon the inmate's request, to telephone

the inmate's attorney as often as resources of the institution allow."  28 C.F.R.

§ 551.117.  Finally, "Staff may allow a pretrial inmate special visits to protect the

inmate's business interests or to help prepare for trial."  28 C.F.R. § 551.120.

Together, these regulations create a structural framework that can guide one-on-

one consultations with counsel that occur outside of public view.

The other consideration affecting the definition of a "private consultation" is

confidentiality and privilege.  "A lawyer shall not reveal information relating to the

representation of a client unless the client gives informed consent, the disclosure

is impliedly authorized in order to carry out the representation or the disclosure is

permitted by paragraph (b) [listing various exceptions]."  *Model Rules of Prof'l*

*Conduct* R. 1.6 (2011).  With respect to privilege, "the attorney-client privilege

may be invoked . . . with respect to: (1) a communication (2) made between

privileged persons (3) in confidence (4) for the purpose of obtaining or providing

legal assistance for the client."  *Restatement (Third) of Law Governing Lawyers*

§ 68 (2000).  "The attorney-client privilege is waived if the client, the client's

lawyer, or another authorized agent of the client voluntarily discloses the

communication in a nonprivileged communication."  *Id.* § 79.  The nuances of an

attorney's obligations regarding confidentiality, privilege, and waiver are too numerous for full discussion here.  For purposes of Rodriguez's pending motion, the Court suffices to say that attorneys work under serious ethical obligations to protect communications with their clients, and that the whole point of those obligations is to ensure comprehensive and candid discussions about a defendant's pretrial strategies.  The technology exists in many detention facilities to shield any telephone call, videoconference, or mailing strictly between attorney and client from third-party disclosure.  Procedures may be necessary to set up the start and the end of those communications, but those procedures must not pose an insurmountable burden.  At least one court appears to have ordered workable procedures in the past:

> Pursuant to 18 U.S.C. § 3142(i)(3), the MCC must provide Janis with a reasonable opportunity for private consultation with his counsel.  In order to effectively represent himself, Janis must also be able to communicate confidentially with his investigator.  The court orders that the MCC allow Janis to conduct private, in-person consultations with his attorneys in all pending litigation and with the court appointed investigator working on the criminal case pending in this district.  The MCC is further ordered not to disclose the contents of any taped or recorded telephone conversation between Janis and his attorneys, investigators or witnesses without further order of the court.  The MCC may disclose the conversations internally, only if necessary, for security of the institution.  If the MCC believes that such tapes must be disclosed for some other purpose, it may apply to the court for an order allowing such disclosure.  This procedure will permit Janis to conduct witness interviews and converse with investigators and counsel without fear that the substance of the conversations will find their way to the prosecution.

*U.S. v. Janis*, 820 F. Supp. 512, 517-18 (S.D. Cal. 1992).  As for face-to-face

communications, ethical obligations would appear not to require any high level of technology and likely could be satisfied with simple physical space that allowed for unrecorded attorney-client communications.

Putting together all of the above information yields fairly straightforward criteria for what a "private consultation" means.  Whether in person, by mail, by telephone, or through a video conference, a "private consultation with counsel" consists of a communication between only a defendant and the defendant's attorney of record that preserves ethical obligations of confidentiality and carries no risk of a waiver of attorney-client privilege.  Such a consultation also would comply with all applicable regulations governing the management of pretrial detainees.

### D)    *Application of statutory language to this case*

Having completed the work of interpreting the language of Section 3142(i)(3), the Court now can apply that section to Rodriguez's circumstances. Rodriguez has presented two concrete facts for the Court's consideration.  The USMS has housed Rodriguez outside of Western New York since May 19, 2014. The USMS also advised all counsel to "consider sending orders to produce (OTP's) 10 business days before scheduled hearing dates . . . . [to] assist us in ensuring the appearance of this defendant."  (Dkt. Nos. 135 at 8 and 136 at 9.) The instruction from the USMS implicitly imposes two burdens on counsel.  No matter what happens in the case or how quickly counsel must react, face-to-face

18

consultation with Rodriguez in this District will not happen immediately; it must wait at least 10 days.  Additionally, and taking the USMS instruction at face value, transporting Rodriguez to this District will occur only for "scheduled hearing dates" and not for "private consultation with counsel."[2]  Taken together, these facts mean that, since May 19, 2014, Rodriguez has not been able to see his counsel unless his counsel found him in Ohio or Virginia.  Stripped of any context, the burden of additional travel imposed on Rodriguez's counsel would be one factor forcing Rodriguez into a different quality of attorney-client relationship than he had while housed in Western New York and other detainees here still have.

Context matters, though, and without more details about the actual management of Rodriguez's remote detention, any attempt to declare compliance with or a violation of Section 3142(i)(3) would require too much speculation.   The Court does not know how many times counsel attempted to arrange visits or to arrange transports while Rodriguez was housed in Western New York.  The Court does not know how many times counsel have attempted to make arrangements since May 19, 2014.  There is no record of policies and actual practices in Ohio and Virginia governing other means of communication— for example, whether the facilities in question actually allow pretrial detainees like

---

[2] In fairness to the USMS, the Court is generally aware from other cases of an informal USMS practice whereby the USMS will transport defendants for private consultation, if a transport van happens to be running from the facility in question for a scheduled court proceeding.

Rodriguez to call their attorneys "as often as resources of the institution allow"—and whether Rodriguez and counsel have availed themselves of those other means.  Finally, the Court knows Rodriguez's criminal history from his original bail report but has no definitive information about behavior reports,[3] medical conditions, or other logistical problems specific to him that could require impositions on the attorney-client relationship.  All of this information would factor into whether Rodriguez has received, or can receive, a "reasonable opportunity for private consultation with counsel."  Without the information, the Court hesitates to proclaim, as did counsel, that Rodriguez's remote detention "has absolutely curtailed his ability to meet with counsel."  (Dkt. 135 at 4.)

Working from available information, then, the Court must deny Rodriguez's bail motion, but prudence warrants making the denial without prejudice.  The Court is disturbed by Rodriguez's distance from Western New York and the likely cost associated with it.  If counsel can develop a more complete record after 60 days that addresses the above factors defining "reasonable" and "private" then they have leave to file a new motion as they see fit.[4]

---

[3] The USMS has stated informally in court that it moved Rodriguez outside of Western New York in part because of incident reports that multiple local detention facilities had to file against him.  Without more specific information in the record, the Court has disregarded this information for now.

[4] At least one case has invoked an alternative remedy to a violation of Section 3142(i)(3), namely, the provision in another part of Section 3142(i) that "[t]he judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  *See U.S. v. Arnaout*, No. 02 CR 892, 2002 WL 31744654, at *1 (N.D. Ill. Dec. 6, 2002)

## IV) CONCLUSION

For all of the foregoing reasons, the Court denies Rodriguez's bail motion (Dkt. No. 135), but without prejudice to revisit the circumstances of his remote detention after 60 days.

SO ORDERED.

_/s Hugh B. Scott_
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: August 18, 2014

---

(invoking the remedy). This Court prefers to avoid that remedy in Rodriguez's case. Having ordered Rodriguez detained twice already, the Court sees a tension between declaring someone a danger to the community but then releasing him anyway for logistical convenience.